Good morning, Your Honors. May it please the Court, Mark Hardiman on behalf of Defendant of the Laser Eye Center and with me at council table is Patrick Cooper on behalf of Dr. Antoine L. Garabet, the other defendant. With the Court's permission and with the agreement of Dr. Garabet and his counsel, I'll be presenting our argument this morning on behalf of both defendants given the identity of interest and issues in this particular appeal. And for simplicity's sake, I'll be referring to the defendants collectively as Dr. Garabet. I'd like to begin, unless the Court wants to jump in, but I'd like to frame what the battle lines are in this particular appeal around the motion for a new trial and whether the district court abuses discretion in denying the defendant's motion for a new trial after Dr. Garabet was convicted of a fraud scheme charging him with not performing laser eye operations that he billed to Medicare, although he was also acquitted of not performing those particular types of surgeries on three other patients. And I think it's a good place to start because the motion for a new trial and how it was decided illustrates what I think are two unusual things about this case, both in the Court below and on appeal. And the first is, of course, at least our perspective, that this case and the defendant's guilt revolved in an unusual fashion around the government's expert testimony in this case. And the second theme that I'll be returning to at various points is that the government's response to the various claims and objections registered below in the district court and the government's responses to most of our claims on appeal, it's unusual because I would submit to this Court that oftentimes how they respond to our arguments supports the arguments and does not undermine them. And with respect to the first issue, it is our position, Your Honors, that the sole evidence that Dr. Garabet did not perform these two laser eye surgeries or the laser eye surgeries on these two particular patients is, of course, the expert testimony of Dr. Schwartz, who testified that he performed fluorescing angiograms on these two patients two to three years after the surgeries were performed by Dr. Garabet. Wasn't there more than that, though? Wasn't there testimony by patients as to the fairly, what I'll call, rapid employment of the equipment, which the experts said was too quick to do the more lengthy surgeries that would have been necessary had the work actually been done? That was The jury had some corroborating testimony from other sources besides the government's expert physician, didn't they? The problem with that, I agree that there was testimony regarding Dr. Garabet's failure to explain the procedure, how fast the procedure occurred, et cetera. The problem with that testimony in terms of linking it up as corroborating circumstantial evidence that the services on these two particular patients weren't performed is that those same facts were applicable to the consecutive day billing patients. And remember that there was that consecutive day billing scheme on which Dr. Garabet was acquitted. And that, as I understand, came in large measure based upon testimony from current and former employees of the clinic as to the way that the patients were handled, the double stamping and that sort of thing. Exactly. But the government also called six patients. And those six patients uniformly testified to the same things Your Honor was alluding to, which is they never got told about sufficiently about pre-operation, what was going to happen afterwards. And they also testified entirely consistently with these two patients about how it was performed. Let me get to where I was going with my question. And that is why would it be improper for the district court in ruling on your motion for a new trial not to consider all of that evidence collectively in determining whether there was sufficient evidence to support the conviction? I understand your argument with regard to the battle of the experts. Right. And I think it's a strong argument. Right. I think what you're trying to do is to cabin the evidence so that that's all we look at. And my question for you is, doesn't the district judge do more on the motion for a new trial in terms of looking at the totality of the evidence as a whole? As compared to say, for example, our position on the motion for judgment of acquittal? Yes. Yes. He looks at all the evidence. But here's the problem when you look at all the evidence. First of all, as I just alluded to, a lot of that evidence that supposedly corroborates the government's position here applies to patients in court below. I know they've changed that soon now. These consecutive day patients, the government never contended that the laser surgeries weren't actually performed on them. Their theory of fraud in that case was it was performed on one day, not two days as billed. Right. So you get a higher level of billing. I understand that. But I guess, doesn't that also go to credibility, though, with regard to Dr. Garibet? In other words, can't the jury also consider, since it really is a battle between the defense experts, Dr. Garibet's testimony and the government's expert physician, doesn't that also go to the credibility of the evidence that the defense is offering? In total? Yes. Could. It could. But I think it shouldn't in this case because of what evidence the defense offered in its motion for a new trial. Because you recall, let's assume, I'll agree with you for the sake of my argument, I'll agree with you that you could make some inferences from this other evidence about how the services were performed. But the fact still remains that what you've got at the core of the government's case is a government expert saying, you know, forget this circumstantial evidence. I look at these fluorescein angiograms two to three years later, and I see no scarring. And therefore, my opinion is, emphatically, Dr. Garibet did not perform laser surgeries on these patients. And why is that? Well, it's beyond the scope of my expertise, Dr. Schwartz says, about whether, you know, time will make scars disappear. But I will still offer an opinion that laser scars are permanent if you perform these type of procedures, and that they will always, in perpetuity, be visible on the angiograms. That's the core of his testimony. So what happens on the motion for a new trial? And that, you know, putting aside whether you agree or disagree about whether there's any corroborating evidence, that's clearly the backbone of the government's case. So after trial, Mangiano, our expert, testified contrary for a variety of reasons. You can't exist during the trial. And he says, yes, Your Honor, fluorescein angiogram, which is the type of test of the retina that the government's expert had examined. And he's got one that he just did on one of his own patients. And in that angiogram, he says, I did, this is new evidence in support of that if this evidence was introduced, it would probably result in I did FMP, focal macular photocoagulation, on this patient five years ago. And that's the problem. And there is no... It may be newly manufactured evidence, and I don't mean that in a counterfeit sense, but it's not newly discovered, because this issue was clearly known before the trial. And if Mangiano wanted to back up his testimony with stuff like that, it should have been done before trial. That's why this is not newly discovered. I would respect... It's been sitting there for five years. I would respectfully disagree, simply because the angiogram had not been done, and there's a medical ethical issue about doing an invasive procedure on his own patient in order to bolster his defense testimony. When did that medical ethical issue go away after the trial? Well, no, the patient... The patient must have agreed to it. The patient came in, and in the usual course of... I mean, Dr. Mangiano did not do this in the usual course of the trial and bolster his own testimony. I don't think there's any evidence of that. But this angiogram was done in the usual course, and then when you look at this angiogram... I'll just assume for a second, just for a second, on the debate about whether it's newly manufactured or discovered. But the significance of it is, Your Honor, is that when you look at that angiogram, there's no scarring. Well, why did the judge turn this away? I don't know, because he didn't address it, and neither did the government. Because what would you expect here, if you were a prosecutor in this case? You get an angiogram from a defense expert that says, hey, look, I looked at this angiogram. This is one of my own patients. This completely knocks the ball out of the park in terms of supporting my version of what you can't do with these angiograms, and what would you expect the government to do? Well, I would submit, Your Honor, that you would expect the government to show this angiogram to Dr. Schwartz, and Dr. Schwartz would come back and, with a declaration, says, Dr. Mangiano's mistaken. I can see scarring on this particular angiogram. Or, even though there was no evidence at trial offered of any tests or studies on the permanence of laser scarring, peer review and publication, error rate analysis, standards of identification for these laser scars, this was the opportunity for the government to come in. You know, we sort of lost track with the Daubert stuff during trial. Here are all the studies that show this angiogram's an aberration, Your Honor. I don't know how it happened, but there are a legion of studies showing that in 90 percent of the time, in 95 percent of the time, if you do these type of procedures. What's your point? If the government didn't come back and say this is baloney, what's your point? My point is that the government's response to this evidence, that if the jury had seen it, is concrete evidence devastating Dr. Schwartz's opinion with silence. You certainly seem to be off on a speculative adventure now. Why didn't your side show it to Dr. Schwartz? We essentially did. We offered, we put it as an exhibit to our motion for new trial, Your Honor. Well, but I mean, you could have contacted Dr. Schwartz before you filed the motion for new trial and said, hey, look at this. Well, we could have. Why didn't you? Because we're not prosecutors, Your Honor. Well, I mean, if you want to say that the government's behavior suggests that they agree with your situation, your behavior by not showing it to Dr. Schwartz suggests that maybe you don't believe in your own declaration. I mean, critical here. I understand what you're saying. You could have shown it to Schwartz, too, and he might have come in with a declaration saying, you know, now that I take a look at this, I got a problem with my own testimony. Our position would be that, in effect, when we file it as an exhibit to a motion for new trial, we're showing it to Dr. Schwartz, and we're submitting it to the government. It's a defense expert declaration. I agree with you that I'm speculating. I agree with you that I'm speculating as to, you know, why it didn't occur. I'm just suggesting to Your Honor that when you look at the impact, the substantive impact, if it's true on what Dr. Schwartz said, if it's true, that this is the, unless speculation is a response to any motion for new trial on newly discovered evidence, and if there's a way to get to a motion for new trial being granted in terms of showing a probability, a probability that it would result in an acquittal, this would seem to be the case, Your Honor, because this angiogram, no longer in terms of Mangiana's opinion, his testimony that these scars disappear with time, here is concrete proof that they do. Unrebutted by the government. Mr. Hardiman, I think, if I understand your argument correctly, I think I would be persuaded if I were the trial judge, if the doctors were the only evidence in the case, and we were just looking at this evidence in isolation, but I'm still troubled with your concession, which I think is a correct view of the law, that on a motion for a new trial, the trial judge has all of the evidence, and I don't think it's fair to say that the only evidence on which the jury convicted Dr. Garibed of fraud was this testimony with regard to the scarring. And I agree that an argument could be made, but I don't think that's the standard that's being applied. You can hold the evidence, but in the end, the standard that's being applied is, if this, assuming it's newly discovered, and I understand Justice Strunk's point about that, but let's assume we get over that, that the standard that then is being applied is whether this evidence, if put in front of the jury, would likely have produced an acquittal. And it seems to me that even if you assume that you could draw some inferences, which we disagree with, actually, but you could draw some inferences from this other evidence, mainly the consecutive day billing and the 700 milliwatt arguments that were being made, that you could draw some inferences, I still think they're strongly in the land of probable acquittal because it wipes out Schwartz's testimony. Okay, so your position, I guess, has to be that the impeaching value of this newly discovered evidence is so devastating that no matter what other evidence the government had to establish fraudulent intent, a new trial had to be ordered here. Well, only because according to, if I'm reading Dr. Schwartz's testimony fairly, Your Honor, is that that angiogram cannot exist. Right. And that's my view of it. He said, yes, Your Honor. Somehow are you unable to talk to Dr. Schwartz about this? I'm interested. He's a killer witness that did your client in with his testimony that there's always an angiogram where there's no scarring. And you want us to speculate as to why the government did what it did. Why wouldn't you go to Dr. Schwartz with this and say, Dr. Schwartz, does this change your opinion on all of this? Well, because we're in an adversary... If it did, you'd go to the court with Dr. Schwartz saying, gee whiz, I'm not so sure myself. Well, I understand your point on that. This is the problem with the word adversary. It's sucked in and they forget the real world. And all of a sudden you're filing motions and stuff like that without working the way... I mean, you're trying to say Schwartz is wrong. But I'm also... Look, I'm a defense lawyer, Your Honor. And I'm not... You know, whether you agree with it or not, the system... And I agree that there's problems with the adversarial system. I spent 23 years with defense lawyers coming to me saying, get out of here. I know. I'm not filing papers in court. I know. I know. But the fact of the matter remains that, you know, it's the prosecutors that are supposed to be not just the zealous advocates. They're the ones that are supposed to be interested in the truth. They're the ones that are supposed to be interested in the big justice picture. I'm not saying that defense lawyers have no obligation to, you know, be forthright with the court to zealously represent their clients. And I'm not just saying that, you know, oh, ask the government what's going on here because of some, you know, implied misconduct or incompetence. I'm just saying that as a prosecutor, I think it's reasonable for me to say, what would a zealous advocate on behalf of the government have done here? And I'm not saying that that decides the issue, but it informs the issue is all I'm saying, Your Honor. And I don't believe we have an obligation beyond, you know, filing our exhibits, saying what our position is, here it is, to go to Dr. Schwartz. How much stronger had you been able to come into court with a subsequent declaration from the government's experts saying, I withdraw my opinion, I guess I was wrong. I now see this evidence that Dr. Mangiano has discovered. It would have been stronger if we had done that. And I think that's all that Judge Trott is asking. And to that extent, that's true. You see, and I only got into this because you started asking us to infer why the government responded the way it did, and to hold their response somehow against them, in the sense that it supports your argument. Right. And I still stand by that, Your Honor. I understand what you're saying about what we could have done. But on the other hand, you say, but this is just an adversary system. So, well, they just played adversary, too. True. But that role goes beyond just adversary. Mr. Hardiman, would you clear up for me, when did Dr. Mangiano perform the angiogram in which he saw no scarring? Four or five days after the verdicts, in this case. Four or five days after the verdict. I could make the same argument, which I'm not going to now, Your Honor, about the significance of the fact that we rush in with our technician and say that the laser machine, which the government has, the laser machine does not put out 700 milliwatts. And I'm sure you would respond, well, we should have tested the machine during trial, et cetera, et cetera, et cetera. But again, the government says nothing about it. They had the machine. They could have come back and said, look, we tested it. This technician is full of baloney. See, I am making the argument now, but, you know, again, here's this big flag that was 700 milliwatts. It either shows he was medically incompetent or it shows that he would have never performed these surgeries, even though he did. Mr. Hardiman, did the defense ever examine the machine after the government took it into their custody? I assume they seized it pursuant to a search warrant.  And we didn't go in and test it. So you didn't look at it? No. No. Okay. And the issue of, you know, the machine output. So it wasn't until after the trial that it occurred to you that, gosh. Well, I don't think that it's completely like the I mean, the issue of like what output of the machine suddenly appeared in Dr. Schwartz's testimony. He started opining about the machine and whether it didn't make quite a point at trial that there was a surprising similarity with regard to the power settings on the machine and all the treatment notes. And our response to that is, is that was true for whether he did it, did the surgery. I mean, they made a big deal about the fact 700 milliwatts, you're going to blow out the patient's retinas. This is incompetent. And the theory of admissibility on that was, you know, he may be a fraudster, but he's not such a fraudster that he would damage the patient's eyes. They said that repeatedly. When we get to trial, they suddenly started listing testimony that he did perform these surgeries using exactly the same power settings. And so their logical theory of relevance on the medical necessity stuff pretty much went out the window. I'm not saying that on some of it, you know, you could make an argument it was in response to Dr. Garib's testimony, but this case had lots of highly prejudicial testimony about standard of care that the government's own shifting responses about it indicated their assumptions as to why this stuff was relevant. Really, it wasn't relevant at all. I cannot believe I'm down to my last 15 seconds, but. I do have one issue that says that the trial judge failed to make findings of fact at the appropriate time in the case, and that he made them later on, and somehow that's a problem and it has to be sent back for reconsideration. Is that true? Yes. I can't quite figure out what difference it's going to make. He's made these findings in writing. So what do you think is going to happen if you go back? Well, because if you look at, I mean, I don't know what's going to happen if it goes back. It has to go back anyway, because the government's conceded that the sentence, the restitution, the restitution amount is incorrect, which I would also point out totally undermines their position that the consecutive day billing people didn't have the services performed on them. But we've been given a credit of $200,000 on the restitution. So it has to go back on sentencing. I think the rule exists. Yes, the government makes a point that, you know, he's just going to say the same thing. And I don't think that's clear, because the oral sentence is in a total guidelines vacuum. And I'm not saying the government can't prepare findings, but these are pretty elaborate findings to come up with how, you know, the sentence and the sentence for both the corporation, the fine, the restitution, fits into the evidence in the case. And that's why you need some type of finding supporting the actual guideline sentence imposed at the time of the hearing or shortly thereafter. So he could readopt them if he wanted to at the hearing? He could readopt them. Okay. But I think there's a good policy reason for why you want the findings made contemporaneous. Well, is part of that that you would have the opportunity to... It would be a fresh... Yes, that would be part of it, that it would be a fresh sentencing. And the findings that he made, did those just appear, or did he send out a request for comment before he made those findings? At the close of the sentencing, he asked the government, as is often the case, to prepare findings. But, and again, I'm not saying that that's always not okay, but there was a complete vacuum in terms of the findings to support suddenly the imposition of sentencing. There were lots of disputed issues, and there were, you know, various motions of downward departure, some of which he could imply that he denied. But this was unusual in terms of the lack of findings at the actual sentencing hearing. So you're saying first the findings, then the sentencing, not the vice versa? Right, or contemporaneous. But first the reversal, and then no sentencing. And my final position would be, first the reversal, and forget about the sentencing, Your Honor. Okay, we'll hear from the government. Thank you. May it please the Court, Assistant United States Attorney Lawrence Ng on behalf of the United States, present with me at council table is Assistant United States Attorney Elliot Krieger. Your Honors, what I'd like to do, in just framing my remarks, is discuss and place in context for you what this case actually involves. Throughout the defendant's appeal is this notion that there were two separate schemes involved. It is true that the government has two schemes, known as the consecutive day billing scheme, as well as the services not performed scheme. The government would like to point out that the services not performed scheme was actually a subset of the consecutive day billing scheme. And the reason is because all the evidence in this case shows that it was the consistent practice of Dr. Garibet to perform or claim services performed on consecutive dates. So whether or not it was strictly with respect to consecutive day billing or services not performed, he always billed as if he performed surgery on two consecutive days. And I assume the government's theory for his motive was because under the CPT codes, he got a higher level of reimbursement? That's correct. When he billed in a consecutive day manner, he maximized his ability to obtain reimbursement from Medicare. Now, it's also the case that there were two separate schemes which were charged in terms of the indictment. The government, however, never took the position or has never conceded that with respect to the consecutive day scheme that both those surgeries occurred. It was charged based on the quantum of evidence available to the government. And so with that context, I wanted to address the defendant's argument relating to the consecutive day billing scheme. It was thrown out by the trial court, wasn't it? It certainly was, Your Honor, under Rule 29. Right. And so I'm not following where you're trying to go with your introduction. Well, again, my point is I just wanted to make it clear for the Court that while defendants' counsel denominates this as two separate schemes, in fact, everything involving consecutive day billing,  that we thought was worth persuasive that allowed us to cart out a subset of cases which we just esteem as the services not performed scheme. And so the relevance of that is that we can consider the totality of the evidence, the evidence that also relates to the consecutive day billing scheme in terms of assessing whether or not Dr. Garibet actually performed the surgeries that he claimed he performed. Because you say the records were phonied up as to consecutive days. They must have been phonied up as to services not performed. Right. Everything was phonied up. That would be the government's position. Is this part of the evidence that you're going to rely on in saying, therefore, it was not an abuse of discretion to turn down this motion for a new trial based solely on this declaration? Well, that's correct, Your Honor. It is not solely Dr. Schwartz's testimony that the government relies on. That's the point you're making. That is, Your Honor. Thank you very much for clarifying that. That was not the only line of evidence. There were several lines of evidence, as one of you has already pointed out. I mean, we have the medical charts. We basically have the systematic falsification of records by Dr. Garibet. We have the systematic misbilling of billing records. And we also have the patient testimony. And that patient testimony is significant because, at least with respect to the charge counts, two of the witnesses said that they never went back to see Dr. Garibet on consecutive days. So at the very least, it's a situation that Dr. Garibet, no matter how skilled he was, he certainly couldn't have performed surgery on days the patients weren't there. This is true, but it seems to me that if you did not have Dr. Schwartz's testimony, that wouldn't be enough to convince somebody beyond a reasonable doubt of the guilt of the defendant, that Dr. Schwartz really was the key evidence in the case. Am I wrong? It was certainly significant, but the government's position would be if a witness comes in and if a witness says, I never went in on a Tuesday, if Dr. Garibet bills for surgery on a Tuesday, that would be false. That would be a claim that he performed surgery when he didn't. To the extent that the jurors were able to view that witness, as well as other witnesses that testified similarly, and draw that conclusion and find that testimony credible, and if they could also take that, combine it with the unvarying pattern of documentation written Dr. Garibet's own hand, the government submits. That would be sufficient to support your case. Joe Jones said, I only went one day, but you got Garibet's billing for day two, and Joe Jones has documentary evidence I was in Cleveland on day two. You got him without Schwartz's testimony. That would be the government's position, Your Honor. I suppose the fellow said, I went in there and I had the surgery on day one. I just didn't have it on day two. Then you can't get him for surgery not performed, because he performed it. Well, not on day two, Your Honor. I don't care how good. But your charge was you charged him for surgery not performed, and if you did it on one day, the surgery was done. Didn't have to do it over two days. But the billing is for surgeries on two separate days, right? You do I-1 the first day, I-2 the second day. That's correct. It was always the – Okay. I did not understand that. It was always surgery on both eyes. Always the right eye would receive surgery the first day, and always the left eye would receive surgery on the second day. Okay. So if he hadn't had it done on the second day, at least one of the eyes wasn't done. At the very least, Your Honor, no matter how skilled a surgeon he was. He could not perform the surgery if the patient was not in the chair. So it would be the government's position, Your Honor, that even without Dr. Schwartz, based on the patient testimony and the unvarying and highly unusual nature of the documentation written in Dr. Garabit's own hand in this case, that would be sufficient to sustain the male count convictions in this case. It's a variation of the old theme. The informant isn't necessary to the conviction. The informant is all they had. The doctor is all they had. The doctor, who cares? We got the witnesses. And, Your Honor, the government doesn't dispute that Dr. Schwartz provided testimony, which certainly was exceeding. In the government's excerpts of record, we've included the fluorescent angiograms, which are a major point of contention on this appeal. And, again, you should review those because you will see with your own eyes, just as the jury saw with their own eyes, what retinas look like that have not had surgery and what they look like when they have had surgery. I'm with you up to the point that the trial judge grants a Rule 29 motion, and all of a sudden all those counts that charge subsequent day billings are now gone from the jury's consideration. And I think that throws a huge wrench in the government's machine here because now we've got a jury that is theoretically only considering, for purposes of guilt or innocence, the counts with regard to services not performed. And, again, that's why it's relevant, Your Honor, that everything was charged on a consecutive day basis. Again, it was never the government's contention that, with respect to the consecutive day scheme, that the surgeries were actually performed. Again, they're not mutually inconsistent positions because it may have to do with a quantum of evidence. It may have been the case that the government decided we have this testimony of Dr. Schwartz. Granted, as Judge Trott would state, it was a significant part of the government's case. And with that photographic evidence, with the fact that the expert, Dr. Schwartz, being the only person who actually examined these people, could go in and say, I sat these folks down in front of a slit lamp, basically an ophthalmoscope. I looked at the retinas, and based on my clinical examination of these patients, I was able to determine whether there was scarring. And why is that the case? Because it is almost always the case that it will be apparent during a clinical examination. Then he goes one step further. In order to corroborate his findings and make sure that his opinion at the slit lamp was correct, he took a fluorescing angiogram, which is nothing more than a medical photograph. It's akin to an X-ray. He took a photograph of the eye, which revealed in fine detail what happened to that eye. And in greater detail, he also noticed there was no scarring. Now, defense counsel makes an issue of this additional declaration that was submitted after the fact by Dr. Maggiano. He had to close the trial. Now, during the trial, the record will reveal that Dr. Maggiano is someone who has done quite a large number of the retinal procedures that were at issue in this case. There were two that were primarily at issue in connection with the services not performed scheme. I believe that the record also reveals, and unfortunately I apologize for not having the pin site, that he has reviewed tens of thousands of fluorescing angiograms. Now, while it may be the case that the specific fluorescing angiogram that was submitted by Dr. Maggiano wasn't available until five days after trial, certainly defendants had available to them the entire resources of the history of Dr. Maggiano's practice. He could have basically submitted declarations. He could have said, I've scoured the file. I've redacted all the personal information, but I represent that this is someone that I have operated on. There is no scarring, and they didn't do that. And one wonders why they didn't do that. He conceded that there was always scarring revealed in these angiograms? He conceded that under the parameters that were documented in Dr. Darabetz's own writing, that is 700 milliwatts of power for a duration of 0.2 seconds, there would invariably be scarring. Invariably. And now that you mention that, Your Honor, I would point out one thing with respect to the new evidence that they seek to submit. Not only is it cumulative, because in his declaration, Dr. Musk, I present this to underscore points I made at trial. Again, he concedes that it's nothing more than an attempt to bolster something that he's already presented at trial. I would direct the Court to the fact that the parameters he used with respect to that patient that's involved in that new declaration, those parameters are different. In our case, consistently, unvaryingly, it was always the case that the records documented 700 milliwatts of power applied for 0.2 seconds. With respect to the patient whose angiograms defendants now claim did not reveal scarring, the energy was much lower. I believe it was 0.150 milliwatts or 150 milliwatts. That would be four times less laser intensity. Not only that, but I believe that with respect to the duration during which that energy was applied, it was only applied for 0.05 seconds. So, again, it was applied for one-fourth as long. If you read the trial testimony of Dr. Schwartz, Dr. Maggiano, and Dr. Freiberg, you will understand that the scarring is a result of two factors, basically the laser intensity and the time. So to the extent that this was a lower laser intensity, to the extent that the duration was much shorter, Dr. Maggiano may not have seen them. But it would be the Governor's position that they would always be present angiographically. I only point out that discrepancy to point out that this is an apples and oranges situation. If they could, you know, it was cumulative in any case, but the relevant determination would have been to show a surgery that was performed under the parameters documented. In fact, that's what the government did. In our case in chief, not only did we provide fluorescing angiograms for the five charge patients in the scheme, but we also provided, for purposes of illustration, the fluorescing astral patients, Mabel Shuck and Teodora Silveira. Those two patients had obvious scarring. And again, in the government's excerpts of record, I believe on either page eight or nine, you can actually see the fluorescing angiogram for Mabel Shuck. Her patient chart reveals that when Dr. Garibet performed her procedure using the 700 milliwatts of power applied for 0.2 seconds, there was obvious scarring. And again, while the government made that apples to apples comparison, defense counsel has not. And so the issue regarding the Maggiano declaration is of no import. It's cumulative and shouldn't be considered. It certainly would not have resulted in an acquittal in this matter. And what other issues would you like to address? Unless any of your honors have any questions, the government. Yeah, I do. The trial judge files his findings later on after the fact with regard to obstruction of justice, minimal planning, and abuse of position of trust. He makes all the necessary findings, but he makes them at a later time. But it seems we have cases that say you have to do this, you have to respond to the objections made at the time of sentencing. Do you agree that's so? Because it does seem that if we send it back, the judge is simply going to say, well, I said it before, and I'm going to say it again. I agree with you. Written findings have already been made. To remand this matter, to require the judge to do what he's already done seems to me to be a bit of form over substance. But to answer your first question. Is it form over substance or, as Mr. Hardiman points out, giving the defense the ability to respectfully argue with the court after it hears what the court has to say with regard to its factual facts? The government, and again, getting back to the first question, and I will dovetail that into a response to your question, Your Honor. It would be the government's position, actually, that Rule 32 requires only that the court make findings with respect to all There's no command that those findings need to be made at the time of sentencing. So that would be the government's position. In this case, however, the government takes the position that oral findings certainly were made because with respect to sentencing, there were two issues, one issue related to how restitution would be calculated and the other related to what loss amount would be used for purposes of determining offense level. Now, in this case, defendant relies on a number of cases. In the government's brief, we've attempted, and I believe successfully so, we've attempted to distinguish each of those cases. We believe that the rule that this court should follow was set forth in U.S. v. DAS. We've explained our position in the government's brief. I would also like to bring to your attention another case, which is United States v. James, which is at 139 F. 3rd, 709. And in that case, it involved a situation where a defendant in a bank robbery was arguing that a vulnerable victim enhancement should not apply. And one of his complaints was that he wanted to avoid the upward adjustment on the grounds that the sentencing judge didn't make adequate findings on the record when he imposed sentence. It turns out that later on, approximately two and a half weeks later, the judge filed a memorandum which elaborated on the reasons for that adjustment. There, this court stated that that elaboration was okay. While it certainly took the position that it would have been nice if the court had made findings at the time, there was no reason that the elaboration, the findings that were made later, couldn't be considered. And the court seemed to latch on to some very important ones. One, was the defendant's ability to appeal hindered? And number two, is this court's ability to review the district court's actions hindered? I would note one other very important fact. Defending in this case, while they objected to the enhancement on the basis of abusive trusts and — I apologize. It escapes me. Obstruction of justice. While he objected pre-sentencing, that's not an issue and it's not before this Court on Appeal. They have not raised that issue at all. Your Honor, it would be the government's position that the findings were adequate in this case. There were oral findings made at the sentencing hearing that resolved all disputed issues so that sentencing could go forward. All of the sentencing decisions made by the judge were later justified in extremely detailed written findings. It would be the government's position that this Court affirm this case and remand for the very limited purpose of recalculating or reconsidering the restitution amount. I'm kind of confused. You say one of the disputed questions that needed to be resolved was the amount of restitution. Is that right? Whether or not relevant conduct would be — whether relevant conduct should include the acquitted counts. Right. But restitution boiled down to a fight over dollar figures. Is that right? That's correct. And what was the government's argument to the sentencing court with regard to how much restitution was owed in dollar terms? In dollar terms, the government argued that it should be the number that the court ultimately decided on. You're arguing that the defendant was responsible for $264,652.98. That is correct, Your Honor. And that would be sort of like saying this guy got away with $264 and have it. He needs to restore it to the government program. That was our original position. Our position today, Your Honor, is — My point is that makes it sound like this guy is a pretty big crook. He got away with $250,000. This was bad stuff. Because the actual loss itself, the figure was what? Mint peanuts, by comparison. $13,000? Well, the actual loss with respect to the patients and the services not performed scheme. That's correct. So it's $13,000. And that's not good, of course. That's right. But it's very different from the government standing up at sentencing saying,  That's correct, Your Honor. How does that present him in a different light than when you come in and say, Gee, we didn't know what we were talking about. We made a big mistake. It's only $64,000. I mean, $200,000 just, like, evaporates. You know, it presents him in a different light only so far as the loss amount is concerned. I think that it's egregious. I think that the consecutive date building scheme actually is less egregious than the fact that this person would place a patient in an operating chair and basically claim to do a surgery that they didn't do. That's where I think that the real upset occurs in this case. That's where I think the egregious conduct lies. How can we be sure that this large restitution figure wasn't weighing somehow on the judge's mind when the judge was deciding what to do on sentencing? Well, again, the judge did weigh that carefully, because the record reveals that the judge said that it was a very close call. It was a very close call. In fact, he even has — What was a very close call? Well, how he was going to deal with respect to whether or not the sentencing for purposes of offense level, whether or not that would include this larger amount that later went into the restitution calculation. He said, I'm going to give the defendant every benefit of a doubt. It's my belief, the judge said, that there was egregious conduct there. There was terrible conduct. And based on our preponderance, based on clear and convincing evidence, the government has shown that 250 pairs of claims basically were false. And he should have to be responsible for that. Now, the reason that the government's position today is that there should be a remand is because, well, we initially took that position. In looking back at the case, while we don't concede that those surgeries actually occurred, it is our position that perhaps we didn't necessarily prove that the first surgery did not occur out of every pair. And so that would be the government's position, Your Honor. That is why — So he's entitled to some compensation, but at a lower amount than what Medicare paid. Correct. And, again, we're doing this just not necessarily because we performed the surgeries. The government has never taken that position and never will. Our position, though, is so far it is the government's burden to basically prove losses to a certain standard. Perhaps we haven't done that, and we don't want to overreach, Your Honor. Did you make a mistake on the first go-around? On the first go-around, well, we didn't think so the first time around. But on reflection, Your Honor. What was it that turned on a different light in your mind on this? You know, based on a reassessment of the case, and, again, trying to, again, deal with the defendant and his situation as we thought appropriate. We thought, you know, while we perhaps could have made that argument, we thought that it was close enough that we might as well give him the benefit of a doubt. It makes me uneasy. Maybe we should vacate the whole sentence and say go start all over again, now that the government has a different take on a lot of this. Your Honor, it's not our position that he ever did it. It relates to the quantum of proof. And, again, it's not on the record, but based on the quantum of proof, so far as the conservative-aid billing scheme is concerned, we don't think that it would have been inappropriate for that to happen. Well, and he wasn't convicted on that scheme, right? Because of the Rule 29. That's correct. So that doesn't impact the sentence on the services not performed, except to the extent, as Judge Trott points out, that the court might view him in a harsher light if he's viewed as somebody who built Medicare out of a quarter of a million dollars. Right. And, again, the government would point out that the court obviously took into account the fact is that there were various factors that should be considered in terms of sentencing by giving the defendant a benefit of a doubt, by going with the lower amount for purposes of determining offense level. Right. Again, there's a spread there. So he wasn't tagged for purposes of the base offense level with the full 264. The court gave him the credit. Oh, a huge credit, Your Honor. It significantly decreased the sentence. If, again, the dollars drove the sentencing decision, the sentence was correct in view of the government's current position, there would be no change. There would be no change. And the only issue would be the new restitution amount. And the government would respectfully request that this matter be remanded for that very limited purpose. Do we have anything else? No, Your Honor. Unless any of you have any questions, the government would submit the matter at this point. Thank you, counsel. Your Honor, I would just, again, reiterate my earlier point about the government's response to some of our arguments on appeal, because the consecutive-day billing scheme, the evidence of the consecutive-day billing scheme, cannot be used to convict my client's under-services-not-performed scheme. He was acquitted of that particular supposement's case. For the government to now say, well, wait a second, we can convict our clients based on the consecutive-day billing scheme because the word performed in connection with the services-not-performed scheme can be now viewed as a way to back-end the scheme that the trial judge rejected. Counsel, as Mr. Ame points out, there is an overlap here, because both schemes purport to be a claim on HCFA for reimbursement for services that your client alleged in the claim were performed on the second day, the surgery on the second eye. And the judge answered the motion for judgment of acquittal on that theory of guilt. As I understood, Mr. Ame, the government's argument here is that if you look at this under the motive of scheme to defraud in order to maximize profits, it's the same motive that's driving each of the two subsets to bill for services that were not, in fact, rendered in order to maximize reimbursement. Right. The jury can conclude, even if they can't convict him on the substantive counts on the subsequent-day scheme, the jury is still entitled to consider that as evidence of his intent to defraud, aren't they? Oh, I don't believe so, Your Honor, because if you- Under a 404B analysis? Well, there wasn't ever a 404B argument made by the government. And in fact- Because it wouldn't be another crime. It was charged in the indictment. Right. But the moment you have the judgment of- The question is really a 403 issue, isn't it, at that point? Not just a 403. It's a balancing of the probative value versus- Well, it would be. But I understand that the fact that the district court entered a judgment of acquittal on that scheme doesn't preclude it being considered as 404B for some purpose. Well, it's not 404B. The analysis at that point has to be 403, doesn't it? Well, it would be 404B because it is not- You look at it, Edmund, Your Honor. That is not the way it is charged. You can look at it and say the word performed includes not performing it on the day you billed it. But they separately charge these two schemes. And the service is not performed is that he never did the surgery. Not that he did one on Monday and one on Tuesday. Because they wouldn't have even needed Schwartz's testimony if it was just a little subset of it. So you have a situation here where a motion for judgment of acquittal is entered. We never put on a defense to it. The judge says on the record I don't think they should have to even put on evidence to respond to the consecutive day billing scheme. Mr. Eng doesn't even cross-examine Dr. Garibet about all of these falsified records that are now suddenly relevant to proving his fraudulent intent. It's never mentioned again, Your Honor. He knows he can't mention it because the judge has determined that there wasn't enough evidence on intent, on his knowledge of the billing modifiers, on any of this to take it to the jury. And so when we make our sufficiency of the evidence arguments, our Dalbert arguments, what you hear the government saying is wait a second. Forget about those arguments. We can still convict him on the consecutive day billing. We're upset that that motion for judgment of acquittal was entered. And it may well be. But that would be – I mean, I would argue that that would be a constructive amendment of the indictment. Take a look at the indictment, Your Honors, because it would be – An amendment when the district court grants a Rule 29 motion? Well, no. To allow – to allow – no, no. To allow these defendants on the services not performed scheme as charged in the indictment to be convicted on a theory that the government has now alleged that a judgment of acquittal was entered onto. Because the way it is charged – But the argument is that because they granted a Rule 29 motion that it's now a constructive amendment. It would be a constructive – That's a very novel argument. Well, that – we made it as also part of our response as to why the records and also the testimony should have been stricken. So is your answer that you do or you don't have a case that supports that theory? Because I've never – I have not cited a case. I think there's support for it, Your Honor. Your argument is very clear. But let's move into the second argument. The government says that Dr. Schwartz was an apple and you brought in an orange. And you brought in an angiogram that was taken at a shorter duration at a lower intensity. Right. So who cares about your different piece of fruit? It would be a who cares if Dr. Schwartz had drawn that distinction with respect to the permanence and visibility of laser scars. Then you could start arguing about it makes a difference with respect to what power you were using as to whether the scarring will occur. He said with a fluorescein angiogram, it doesn't matter what power you use, whether it's sub-threshold, threshold, et cetera. You will always see scarring. Yeah, but the power that was at issue in this case was considerably different than the power that was used in the angiogram that was brought in for the motion for a new trial, wasn't it? No. I don't think there's any evidence to support that. The evidence that Ms. Ang alludes to is that the 700 milliwatts documented in the charts by Dr. Garibet was – you have to assume that that was the power used throughout the procedure. And there was undisputed testimony from all three experts, the two government experts and the defense expert, that you cannot just make that assumption, that it's highly common for doctors to vary the power, that doctors, including Dr. Mangiana, just put down the starting power, that on the machine that Dr. Garibet used, you can vary it with the spot size. Dr. Schwartz agreed that you could do that. So the significance of the 700 milliwatts is you have to make an assumption that's unsupported by any other evidence, that that was the power that was used from beginning to end. And the moment that – Did he testify I varied the power? Yes. And the – on that particular point was zero. So – and since – you know, maybe you could make that assumption for purposes of a malpractice case or, you know, Medicare saying we shouldn't pay this because you didn't adequately document it, you know, what range you were using. But all three experts agreed to numerous variables. And this is, you know, drifting back to the sufficiency. But Dr. Schwartz agreed with Dr. Mangiana that he didn't know what had occurred during the surgeries, that different ophthalmologists disagree about power settings, that they disagree about spot size, that they disagree about, you know, numerous things. Dr. Mangiana says these are incomplete angiograms. These angiograms, as Mr. Eng says, go back into chambers and look at, they're 5 to 10 percent of the retina. So unless you know exactly where Dr. Garibet was hitting with the laser, it's just a lottery, Your Honor, as to whether this particular angiogram is going to show the laser scars. It assumes that Dr. Garibet is competent. It's a whole series of assumptions. And do you have anything else to say on the sentencing issue? We don't want to go back for sentencing, Your Honor. We want to go back for a new trial. Okay. Thank you, Counselor. The case is argued as ordered and submitted. Thank you both for your help. It's a very interesting case.
judges: Thompson, Trott, Tallman